UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ALEXANDER FIGUEROA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-30006-KAR |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION
(Docket Nos. 17 & 20)

ROBERTSON, U.S.M.J.

I.   INTRODUCTION AND PROCEDURAL HISTORY

Alexander Figueroa ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a final decision of the Commissioner denying his application for Social

Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

Plaintiff applied for DIB and SSI on April 3, 2017, alleging an April 19, 2014, onset of disability

due to a back problem and both of his wrists (Administrative Record "A.R." at 366-378, 416).[1]

His application was denied initially (A.R. 217-20) and on reconsideration (A.R. 223-28).  He

requested a hearing before an Administrative Law Judge ("ALJ"), and one was held on May 9,

2019 (A.R. 54-87, 231-33).  On July 30, 2019, the ALJ issued an unfavorable decision (A.R.

---

[1] All citations to "A.R." refer to the administrative record, which appears on the docket of this case as document 11.  The page numbers were assigned by the Social Security Administration ("SSA") and appear in the lower right-hand corner of each page.

187-210).  The Appeals Council vacated the Commissioner's decision and remanded the case to

the ALJ for further proceedings (A.R. 211-15).  In accordance with the remand order, a second

hearing was held on January 14, 2021 (A.R. 88-126).  On March 30, 2021, the ALJ again issued

an unfavorable decision (A.R. 14-45).  The Appeals Council denied further review on November

16, 2021 (A.R. 3-8), and, thus, Plaintiff is entitled to judicial review.

Plaintiff seeks remand based on his contention that the ALJ erred by not assigning

controlling weight to the opinion of one of his treating mental healthcare providers.  Before the

court are Plaintiff's motion for judgment on the pleadings (Dkt. No. 17), and the Commissioner's

motion for an order affirming her decision (Dkt. No. 20).  The parties have consented to this

court's jurisdiction (Dkt. No. 16).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons

set forth below, the court DENIES Plaintiff's motion and ALLOWS the Commissioner's motion.

## II.  STANDARD OF REVIEW

The district court may enter a judgment affirming, modifying, or reversing the final

decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).

Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by

substantial evidence and whether the correct legal standard was used.'"  *Coskery v. Berryhill,*

892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)).  The

court reviews questions of law *de novo*, *id.*, but "the ALJ's findings [of fact] shall be conclusive

if they are supported by substantial evidence, and must be upheld 'if a reasonable mind,

reviewing the evidence in the record as a whole, could accept it as adequate to support his

conclusion,' even if the record could also justify a different conclusion."  *Applebee v. Berryhill*,

744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human*

*Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981)).  "Substantial-evidence review is more deferential

2

than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not."  *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee*, 744 F. App'x at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

III. DISABILITY DETERMINATION

A.  The Legal Standard for Entitlement to DIB and SSI

In order to qualify for DIB and SSI, a claimant must demonstrate that he is disabled within the meaning of the Social Security Act.[2]  A claimant is disabled for purposes of DIB and SSI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An "individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or

---

[2] There is no challenge to Plaintiff's insured status for purposes of entitlement to DIB, *see* 42 U.S.C. § 423(a)(1)(A), or to his financial need for purposes of entitlement to SSI, *see* 42 U.S.C. § 1381a.

whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the SSA. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). The hearing officer must determine whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant suffers from a severe impairment; (3) the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) the impairment prevents the claimant from performing previous relevant work; and (5) the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

Before proceeding to steps four and five, the Commissioner must assess the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See id.*

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate RFC. *See Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th

Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in

the national economy that the claimant can perform notwithstanding his restrictions and

limitations.  *See Goodermote*, 690 F.2d at 7.

    B.  <u>Evaluating Opinion Evidence</u>

    For claims filed before March 27, 2017, an ALJ applies the "treating source rule,"

pursuant to which  "more weight" is given to the opinions of treating physicians because "these

sources are likely to be the medical professionals most able to provide a detailed, longitudinal

picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the

medical evidence that cannot be obtained from the objective medical findings alone or from

reports of individual examinations."  20 C.F.R. § 404.1527(c)(2); 416.927(c)(2).  An ALJ must

give "controlling weight" to, and adopt, a treating physician's opinion on the nature and severity

of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence"

in the record.  *Id*; *see also* SSR 96-2p, 1996 WL 374188, at *2.

    However, "the law in this circuit does not require ALJs to give greater weight to the

opinions of treating physicians."  *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89

(1st Cir. 1991.  Pursuant to the regulations, an ALJ may discount the weight given to a treating

source opinion where it is inconsistent with other substantial evidence in the record, including

treatment notes and evaluations by examining and non-examining physicians.  *Arruda v.

Barnhart*, 314 F.Supp.2d 52, 72 (D. Mass. 2004); 20 C.F.R. § 404.1527(c)(2)-(4); 416.927(c)(2)-

(4); *see also* SSR 96–2p, 1996 WL 374188, at *2.  Where an ALJ does not give

controlling weight to a treating source opinion, the ALJ must consider an array of factors to

determine what weight to grant the opinion, including the length of the treatment relationship

and the frequency of examination, the nature and extent of the treatment relationship, the degree

to which the opinion can be supported by relevant evidence, and the consistency of the opinion

with the record as a whole.  *See* 20 C.F.R. § 404.1527(c)(2)-(6); 416.927(c)(2)-(6).  Further, the

regulations require adjudicators to explain the weight given to a treating source opinion and the

reasons supporting that decision. *See* 20 C.F.R. § 404.1527(c)(2); 416.927(c)(2) ( "We will

always give good reasons in our notice of determination or decision for the weight we give your

treating source's opinion.").  "[E]ven when an ALJ does provide reasons for discounting

a treating source opinion, remand is proper if those reasons are 'unpersuasive' or 'significantly

flawed.'" *Santana v. Colvin*, No. 15-cv-13232-IT, 2016 WL 7428223, at *3 (D. Mass. Dec. 23,

2016) (quoting *Johnson v. Astrue*, 597 F.3d 409, 411-12 (1st Cir. 2009)).

IV.     RELEVANT FACTUAL BACKGROUND

A.  Plaintiff's Background

Plaintiff was forty-one years old at the time of the hearing (A.R. 93).  He has a ninth-

grade education (A.R. 93).  His primary work experience has been as a kitchen helper (A.R. 96).

B.  Medical Records Relevant to Plaintiff's Claim[3]

On May 11, 2016, Plaintiff was seen by Ashley Kosinski, PA-C, at Riverbend Medical

Group ("Riverbend") for wrist pain (A.R. 520-23).  Plaintiff reported that he was very anxious

and was suffering with insomnia (A.R. 521).  Upon inquiry, Plaintiff reported both suicidal and

homicidal ideation (A.R. 521).  Plaintiff denied ever seeing a therapist or psychiatrist and

advised that he was not currently on any antidepressants (A.R 521).  Plaintiff was fully oriented

but presented with a tearful, depressed mood (A.R. 522).  Plaintiff agreed to be sent by

---

[3] Because Plaintiff only challenges the ALJ's evaluation of his treating psychiatrist's opinion, the
court limits its discussion of the evidence to that pertaining to Plaintiff's mental impairments.

ambulance to Baystate Medical Center Emergency Medicine ("Baystate Emergency") for further evaluation and treatment (A.R. 522).

When Plaintiff reached Baystate Emergency, he denied acute suicidality (A.R. 746).  His mood was anxious and depressed, but he was alert and oriented with no focal neurological deficit observed and normal speech and coordination (A.R. 747).  In addition, Plaintiff was cooperative and exhibited normal judgment (A.R. 747).  Following a mental health evaluation, Plaintiff was discharged with a plan for outpatient management (A.R. 747-48).

When treating with James Schumacher, M.D., at Riverbend on July 19, 2016, for wrist pain, Plaintiff reported feeing stressed about being out of work (A.R. 513).

Plaintiff was seen by Loic Assobmo, N.P., at Riverbend on February 12, 2018, at which time Plaintiff reported increased stress, depression, insomnia, and sometimes sleep walking (A.R. 677-78).  Plaintiff stated that he was coping with the recent loss of a friend, which brought back thoughts of childhood abuse and previous stints in jail (A.R. 678).  According to Plaintiff, he was having occasional anger outbursts and arguing with his girlfriend (A.R. 678).  Upon examination, Plaintiff was alert, in no acute distress, and oriented to person, place, and time (A.R. 679).  Assobmo's impression was of anxiety and depression with anger.  Assobmo referred Plaintiff to behavioral health for an evaluation (A.R. 680).

On September 12, 2018, Plaintiff met with Remy Tetreaux of Sunrise Behavioral Health Center ("Sunrise") for an assessment (A.R. 625-33).  Plaintiff reported depression, suicidal thoughts, trauma, audio and visual hallucinations, and nightmares (A.R. 625).  Plaintiff exhibited avoidant eye contact, slumped posture, slowed body movement, constricted emotional state-affect, lack of facial expression, and a short attention span (A.R. 628-29).  He had auditory and visual hallucinations (A.R. 629).  His appearance, behavior, speech, thought content, thought

process, intellectual functioning, orientation, insight, and judgment were all within normal limits (A.R. 628-29). Tetreaux opined that Plaintiff would benefit from one-on-one therapy and referred Plaintiff for a medical evaluation with a psychiatrist (A.R. 633).

Plaintiff had a medical diagnostic evaluation with Malcolm Freedman of Sunrise on October 16, 2018 (A.R. 618-24). Plaintiff's chief complaints were of anger, irritability, insomnia, depression, worthlessness, and isolation (A.R. 618). Freedman described Plaintiff as a "fair historian" who presented with irritability and anger about his situation (A.R. 618). Plaintiff admitted to using marijuana on a regular basis and alcohol weekly (A.R. 618). He wore sunglasses throughout the interview (A.R. 619). A mental status examination revealed a restless appearance; normal tone and gait; pressured speech; concrete thought processes; no abnormal or psychotic thoughts; auditory and visual hallucinations; mildly impaired attention, concentration, fund of knowledge, short-term memory, and long-term memory; moderately impaired judgment/insight; full orientation; normal comprehension and expression; an anxious and irritable mood; and a constricted affect (A.R. 620-22). Freedman recommended Plaintiff participate in individual therapy (A.R. 622).

The following day, Plaintiff met with his primary care physician, Antone B. Cruz, M.D., at Riverbend (A.R. 659-64). Plaintiff reported depression and anxiety (A.R. 660). He advised Dr. Cruz that he had spoken with a psychiatrist the previous day, that no medications had been offered, and that he had been told to speak to his PCP about medications (A.R. 660). Plaintiff stated that he was hearing voices telling him to do illegal things such as robbery or hurting himself, but he denied present suicidal ideation (A.R. 660). He reported that he was experiencing some relief with therapy (A.R. 660). Dr. Cruz started Plaintiff on trazodone to help with Plaintiff's sleep (A.R. 663).

Plaintiff saw Dr. Cruz again on November 12, 2018 (A.R. 656-59).  At the time, Plaintiff reported some improvement on the trazadone but was still not sleeping through the night (A.R. 656).  Dr. Cruz added a prescription for Elavil for Plaintiff's chest pain and stated that it could improve his insomnia (A.R. 659).  Dr. Cruz noted that Plaintiff was to be seen by behavioral health within the month (A.R. 659).

On November 28, 2018, Plaintiff followed up with Nicholas Tobin at Sunrise (A.R. 1000-05).  Plaintiff reported having trouble falling and staying asleep and described his mood as mostly withdrawn and irritable with excessive worry, trouble concentrating, and becoming overwhelmed easily (A.R. 1000).  Plaintiff denied paranoid or suspicious thinking, thoughts of harming himself or others, panic attacks, and nightmares or flashbacks but did report auditory hallucinations of people calling his name (A.R. 1000).  Plaintiff stated that he had a cannabis license and that he used daily, which helped with his anxiety but not his sleep (A.R. 1000).  Plaintiff's mental status examination was largely normal, with the exception of a mild impairment to his judgment/insight and an anxious mood and affect (A.R. 1002-03).  Plaintiff was diagnosed with major depressive disorder, recurrent/severe, with psychotic features and post-traumatic stress disorder (A.R. 1003).  He was prescribed Lexapro and Ambien (A.R. 1004).

On January 21, 2019, Plaintiff met with Edgardo Rodriguez, M.D., at Sunrise (A.R. 997-99).  Plaintiff reported that his current medications were not working, as he continued to experience insomnia, feeling depressed at times, hopeless and helpless, irritable, and angry most of the time (A.R. 997).  Dr. Rodriguez described Plaintiff's mental status as follows: "cooperative, wearing a cap and dark eyeglasses, speech was adequate but loud at times, mood was irritable and affect was labile, coherent, relevant, and logical, no suicidal or homicidal ideas,

no psychosis, insight and judgment limited, concentration is fair and attention is good, alert and fully oriented" (A.R. 997). Dr. Rodriguez diagnosed Plaintiff with bipolar disorder; cocaine, opioid, and hallucinogen dependence in sustained remission; and cannabis dependence (A.R. 997). Dr. Rodriguez discontinued Plaintiff's Lexapro and Ambien and started Plaintiff on Depakote and trazodone (A.R. 998).

Plaintiff followed up with Dr. Rodriguez on April 1, 2019 (A.R. 991-996). Plaintiff reported that 100 mg of trazodone made him too sleepy during the day while 50 mg did not work (A.R. 991). Upon examination, his mental status was mostly normal except that he was irritable and angry, his concentration was moderately impaired, and his judgment/insight was severely impaired (A.R. 993-94). Dr. Rodriguez discontinued the prescription for trazadone and started Plaintiff on doxepin (A.R. 994).

On May 21, 2019, Plaintiff again followed up with Dr. Rodriguez (A.R. 1046-051). Plaintiff reported that he felt nothing with Depakote, but he did well with doxepin (A.R. 1046). He complained of anxiety on and off and advised Dr. Rodriguez that he would be traveling to Cuba with 20 relatives in August (A.R. 1046). Plaintiff's mental status examination was largely normal except that he exhibited mild impairment of judgment/insight and was irritable (A.R. 1048-49). Dr. Rodriguez continued Plaintiff on doxepin and increased his dosage of Depakote (A.R. 1050).

On July 17, 2019, in follow-up with Dr. Rodriguez, Plaintiff reported trouble sleeping again (A.R. 1052-57). He was to go on a cruise the following month (A.R. 1052). Plaintiff's mental status was normal except that he was irritable (A.R. 1054-55). Dr. Rodriguez increased Plaintiff's dosage of doxepin (A.R. 1056).

On October 17, 2019, Plaintiff advised Dr. Rodriguez that he had stopped taking both of his medications because he did not feel a difference (A.R. 1142-1147). He reported being angry most of the time due to past traumatic experiences and admitted that he was using more marijuana and binge drinking on the weekends (A.R. 1142). Dr. Rodriguez noted Plaintiff was sad, angry, and anxious and had a moderate impairment to his concentration and judgment/insight (A.R. 1144-45). Dr. Rodriguez discontinued doxepin and Depakote and started Plaintiff on Seroquel and lithium (A.R. 1145).

The following month, on November 14, 2019, Plaintiff reported to Dr. Rodriguez that he was feeling more relaxed and calmer with the new medications but was still easily stressed and overwhelmed (A.R. 1136-41). He reported decreased alcohol consumption (A.R. 1136). Other than loud speech, a moderate impairment to his judgment/insight, an irritable mood, and a labile affect, Plaintiff's mental status was normal (A.R. 1138-39). Dr. Rodriguez continued Plaintiff on Seroquel and lithium (A.R. 1139).

On January 14, 2020, Plaintiff, in follow-up with Dr. Rodriguez, reported continued feelings of depression, worthlessness, and hopelessness nearly every day perpetuated by distressing memories, including flashbacks, of when he was abused during childhood (A.R. 1130-35). Plaintiff reported more cannabis use and alcohol binges as a result (A.R. 1130). Plaintiff denied suicidal ideation (A.R. 1130). Upon examination, Plaintiff's mood and affect were sad, angry, and anxious, and he exhibited a moderate impairment in his concentration and judgment/insight (A.R. 1132-33). Dr. Rodriguez continued Plaintiff on Seroquel, increased his lithium dose, and started him on Paxil (A.R. 1133).

Plaintiff went for a physical with Dr. Cruz on January 31, 2020 (A.R. 1121-27).  Plaintiff advised Dr. Cruz that his depression was not well controlled (A.R. 1121).  Dr. Cruz observed Plaintiff to be anxious, but he was awake, alert, and fully oriented (A.R. 1124).

Plaintiff met with Dr. Rodriguez by phone on May 12, 2020, due to the COVID-19 pandemic, and he reported being overwhelmed with the lockdown and taking care of his stepdaughters; he had been unable to pick up his medication refills the previous month (A.R. 1185-88).  Plaintiff was irritable and exhibited mildly impaired concentration and insight and moderately impaired judgment (A.R. 1186-87).

On July 31, 2020, Plaintiff received telehealth services from Dr. Cruz, and he reported increased symptoms due to being "locked in the house" (A.R. 1150).  Plaintiff noted that he was doing video chats with a therapist every other week and seeing a psychiatrist once per month (A.R. 1150).  According to Plaintiff, his symptoms were not being optimally controlled with the therapy and his psychiatric medications; he reported that marijuana was more effective (A.R. 1150).  Plaintiff denied suicidal or homicidal ideation, and Dr. Cruz deferred management to Plaintiff's psychiatrist and therapist (A.R. 1152).

On November 3, 2020, Plaintiff reported to Dr. Rodriguez that he had been told to stop all psychotropic medications after an episode of diverticulitis (A.R. 1192-95).  On mental status examination, Plaintiff was anxious and irritable, had a mild impairment to his concentration, and a moderate impairment to his judgment and insight, but all other findings were normal (A.R. 1193-94).  Dr. Rodriguez continued all of Plaintiff's medications (A.R. 1194).

On December 11, 2020, Plaintiff was discharged from counseling services that had been set up in May 2020 (A.R. 1196-97).  While the therapy recommendation had been once per week, Plaintiff had only been seen four times over a period of five months (A.R. 1196).  Plaintiff

12

had difficulty scheduling followed by a number of no-shows, and his case was closed due to noncompliance with the agency attendance policy (A.R. 1196).

    C.    <u>Opinion Evidence</u>

        1.    *Consultant Anthony Roselli, M.D.*

On August 23, 2017, Anthony Roselli, M.D., completed a consultative examination on Plaintiff (A.R. 602-09).  Roselli described Plaintiff as pleasant, in no acute distress, and fully oriented (A.R. 602).  Plaintiff's mood was neutral; his speech was clear and coherent with appropriate verbal content; and his memory, concentration, general fund of knowledge, insight, and judgment were all intact (A.R. 603).

        2.    *Kimberly Henderson Kjellen, Psy. D.*

Also on August 23, 2017, Kimberly Henderson Kjellen, Psy. D. completed a psychological interview of Plaintiff (A.R. 610-14).  Plaintiff reported a down mood, weight gain, irritability, and difficulty sleeping (A.R. 611).  He stated that he had trouble concentrating, suffered nightmares and flashbacks, felt stressed all the time, was hypervigilant, and sometimes heard someone calling his name when no one was doing so (A.R. 611).  Plaintiff advised that he suffered from intrusive thoughts related to sexual abuse he experienced at eight years old (A.R. 611).  He admitted to thoughts of suicide but denied homicidal ideation (A.R. 611).  Plaintiff said he was not very sociable but was able to communicate with others as needed and described his interactions as generally appropriate and effective (A.R. 611).  He admitted to smoking six or more marijuana blunts daily and consuming approximately a six-pack of beer about twice monthly (A.R. 611).  Plaintiff reported that, for leisure, he likes to go to the beach, take a family walk, or go to Six Flags amusement park (A.R. 611).

Dr. Kjellen observed Plaintiff to be alert and cooperative.  He made regular eye contact, his posture was relaxed, his energy was within normal limits, and he was polite and maintained a pleasant disposition (A.R. 612).  He was talkative, his voice was within normal limits of rate and tone, and his speech was relevant, organized, and coherent (A.R. 612).  He appeared sad and his affect was congruent (A.R. 612).  Dr. Kjellen noted that Plaintiff was fully oriented and his thought processes were goal directed, logical, and there was no evidence of loose association or tangential thinking (A.R. 612).  Dr. Kjellen did not note any immediate, recent, or remote memory problems (A.R. 612).  Finally, Plaintiff demonstrated adequate attention and comprehension skills (A.R. 612).

Dr. Kjellen's diagnostic impression included cannabis use disorder, major depressive disorder, PTSD, and rule out antisocial personality disorder (A.R. 613).  She opined that Plaintiff could understand, retain, and follow instructions but might have difficulty sustaining attention to perform simple repetitive tasks due to his report of problems with concentration (A.R. 613).  She noted that Plaintiff had difficulty tolerating stress and managing his anger as evidenced by his substance use (A.R. 613).

2.    *State Agency Assessments*

On September 7, 2017, Michael Maliszewski, Ph. D., completed a disability assessment of Plaintiff's mental health impairments for purposes of his DIB and SSI claims (A.R. at 136-38, 150-52).  Based on review of the records, Dr. Maliszewski found Plaintiff's attention to be sufficiently intact to perform simple tasks and opined that Plaintiff would perform better in a more independent job role (A.R. 137-38; 151-52).  On July 9, 2018, on reconsideration, Carlene Tucker Okine, Ph. D., agreed with this opinion (A.R. 166-68, 180-82).

14

3.    *Mental Impairment Questionnaire*

On May 1, 2019, Dr. Rodriguez completed a Mental Impairment Questionnaire in support of Plaintiff's disability application (A.R. 1008-11).  Dr. Rodriguez reported that Plaintiff had been seen for therapy on a weekly basis for the previous nine months and was being seen for medication management monthly (A.R. 1008).  Dr. Rodriguez identified Plaintiff's diagnoses as Bipolar Disorder and PTSD and indicated that the therapy was intended to develop distress tolerance, emotion regulation, and interpersonal communication skills, and that there had been some progress (A.R. 1008).  The clinical findings on which Dr. Rodriguez relied included anhedonia, avoidant eye contact, slumped posture at times, restlessness, agitation, anger, command hallucinations, racing thoughts, and suicidal ideation (A.R. 1008).  He opined that Plaintiff's prognosis was poor (A.R. 1008).  Regarding functional limitations, Dr. Rodriguez opined that Plaintiff had moderate restriction of activities of daily living, extreme difficulties with maintaining social functioning and maintaining concentration, persistence, or pace, and four or more episodes of decompensation within a 12-month period, each of at least two weeks duration (A.R. 1008).[4]  Dr. Rodriguez checked off that Plaintiff had an anxiety related disorder and complete inability to function independently outside of the area of his home and that, on the average, Plaintiff's impairment or treatment would cause him to be absent from work more than four days per month (A.R. 1011).

---

[4] The questionnaire defines episodes of decompensation as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace.  Episodes of decompensation may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)" (A.R. 1010).

D.    Testimony at the Hearings

At the May 9, 2019, hearing, Plaintiff told the ALJ that he had problems with depression and anxiety and had started weekly therapy six months earlier (A.R. 70).  He also reported seeing a psychiatrist every 30 days for medication and that the medications were helping gradually (A.R. 79).  He denied being hospitalized for mental health issues in the last four years (A.R. 70-71).  According to Plaintiff, his depression caused him to feel lonely, stressed, and angry (A.R. 80).  His anxiety caused shaking, sweating, an inability to stay still, and the need to go outside for air (A.R. 80).  He also reported problems being around a lot of people and with concentration and memory  (A.R. 80-82).  Plaintiff testified that he had traveled to Florida the previous year to take his kids to Disney (A.R. 72-73).

At the January 14, 2021, hearing, Plaintiff testified that he had anger issues related to his childhood trauma (A.R. 102).  He reported that he was seeing a therapist on a weekly basis and a psychiatrist for medication once a month (A.R. 102, 112-13).  According to Plaintiff, his psychiatric medications took the edge off (A.R. 113).  Plaintiff denied hospitalization for mental health issues in the two previous years (A.R. 103).  Plaintiff described feeling like the world was about to end when he was depressed and feeling nervous and unable to sit still when he was anxious (A.R. 113-14).  He stated that being around people was difficult because he felt like they were after him or were talking about him (A.R. 115).  Plaintiff described grocery shopping at night and going in and out of the mall to avoid crowds (A.R. 115).  He reported self-medicating with marijuana and alcohol and having concentration and memory problems (A.R. 115-17).  Plaintiff testified that since the first hearing, he had been on a cruise to Mexico (A.R. 105).

E.      The ALJ's Decision

The ALJ conducted the requisite five-step sequential analysis.  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 19, 2014 (A.R. 20).  At the second step, he found that Plaintiff's severe impairments included degenerative disc disease of the lumbar spine, status post arthroscopic and fusion procedure to the left wrist with residual pain, obesity, hypertension, a bipolar disorder, polysubstance dependence in remission, a major depressive disorder, and post-traumatic stress disorder (A.R. 20).  The ALJ also found that Plaintiff had multiple non-severe impairments, including headaches and gastroesophageal reflux disease (A.R. 20).  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment (A.R. 20).  Before proceeding to steps four and five, the ALJ found that Plaintiff had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is limited to simple routine tasks.  He is limited to no more than frequent grasping, pinching, and twisting with the left hand.  He is limited to no more than occasionally co-worker contact and no more than incidental public contact.  He is limited to no more than incidental exposure to extremes of cold or vibration.  The claimant is limited to no direct overhead lifting or reaching.  The claimant should not operate foot or leg controls.  He could perform no work at heights or around ladders, ropes, or scaffolds.

(A.R. 22-23).  At step four, the ALJ determined that Plaintiff was unable to perform past relevant work (A.R. 36).  Finally, at step five, the ALJ found that Plaintiff could perform jobs found in significant numbers in the national economy taking into account Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was not disabled (*id*. at 36).

IV.     ANALYSIS

Plaintiff's argument on appeal is that the ALJ erred by not assigning controlling weight to

the opinion of his treating mental health provider, Dr. Rodriguez.  The ALJ assigned Dr.

Rodriguez's opinion little weight, explaining as follows:

> While Dr. Rodriguez was a treating source with Sunrise Behavioral
> Health, his overall opinion statement is not consistent with the
> objective records from either Sunrise Behavioral Health or the
> records from Dr. Kjellen, who was an objective consultative
> examination.  During treatment with Sunrise, the claimant's
> limitations were mild to moderate at most ….  There were times in
> fact where examination was fairly normal overall as well ….  Dr.
> Kjellen also performed a full examination on the claimant and
> during this examination he had minimal findings ….  Therefore,
> the marked limitation assigned by Dr. Rodriguez appear to be
> based on the subjective statements of the claimant and not the
> objective evidence throughout.  In contrast, the DDS and opinion
> of Dr. Kjellen are consistent with the objective findings.  As such,
> overall, the undersigned finds the opinion statements from the
> DDS (Dr. Okine and Dr. Maliszewski) and also the opinion of Dr.
> Kjellen to be assigned significant weight while the opinion of Dr.
> Rodriguez is assigned little weight

(A.R. 34-35).  The court finds no error in the ALJ's analysis or conclusions.

It is clear from the discussion in the decision that the ALJ considered the required array

of factors in determining to assign Dr. Rodriguez's opinion little weight, namely the length of

Plaintiff's treating relationship with Dr. Rodriguez and the frequency of examination, the nature

and extent of Plaintiff's treatment relationship with Dr. Rodriguez, the degree to which Dr.

Rodriguez's opinion could be supported by relevant evidence, the consistency of Dr. Rodriguez's

opinion with the record as a whole, Dr. Rodriguez's specialty as a psychiatrist, and other factors.

*See* 20 C.F.R. §§ 404.1527(c)(2)-(6); 416.927(c)(2)-(6).  The ALJ's discussion of Plaintiff's

treatment notes included consideration of factors (c)(3) and (c)(4): the degree to which the

opinion is supported by relevant evidence and the consistency of the opinion with the record as a

whole.  The detailed discussion of Plaintiff's treatment with Dr. Rodriguez also implicitly demonstrates the ALJ's consideration of the other factors, including the treatment relationship between Plaintiff and Dr. Rodriguez, Dr. Rodriguez's specialty, and other relevant factors.  *See* 20 C.F.R. §§ 404.1527(c)(2), (5), (6); 416.927(c)(2), (5), (6).

While the ALJ did not expressly state how he considered each factor in the decision, the regulations did not require him to do so.  To the contrary, the regulations require "only that the decision provide 'good reasons' for the weight given to a treating source opinion."  *Bourinot v. Colvin*, 95 F. Supp. 3d 161, 177 (D. Mass. 2015) (quoting 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2)).  Here, the ALJ did precisely that.  Dr. Rodriguez opined that Plaintiff had moderate functional limitations in his activities of daily living and extreme limitations in maintaining social functioning and maintaining concentration, persistence, or pace (A.R. 1010).  In addition, he opined that Plaintiff had a complete inability to function outside his home and would be absent for four or more days per month (A.R. 1011).  The ALJ explained that Dr. Rodriguez's assignment of marked limitations to Plaintiff was inconsistent with the records from Sunrise and the records from Dr. Kjellen and was not supported by the objective evidence throughout the record.  Instead, they appeared to be based on Plaintiff's subjective statements.  "Remand is not required where, as here, 'it can be ascertained from the entire record and the ALJ's opinion that the ALJ "applied the substance" of the treating physician rule.'"  *Bourinot*, 95 F. Supp. 3d at 177 (D. Mass. 2015) (quoting *Botta v. Barnhart*, 475 F. Supp. 2d 174, 188 (E.D.N.Y. 2007)).

Moreover, the findings on which the ALJ relied in assigning Dr. Rodriguez's opinion little weight are supported by substantial evidence.  First, the ALJ discussed the contradictory findings from Dr. Kjellen's consultative examination (A.R. 32-33).  At the time of Dr. Kjellen's

examination in August 2017, before Plaintiff had received any mental health treatment, Plaintiff

was alert, cooperative, and made regular eye contact (A.R. 612).  His speech was relevant,

organized, and coherent (A.R. 612).  He was fully oriented, his thought processes were goal

directed and logical, and there was no evidence of loose association or tangential thinking (A.R.

612).  Dr. Kjellen noted no memory problems and Plaintiff demonstrated adequate attention and

comprehension skills (A.R. 612).  These objective findings by Dr. Kjellen are inconsistent with

the marked limitations assigned by Dr. Rodriguez.  It is black letter law that "[i]nconsistencies

between a treating physician's opinion and other evidence in the record are for the ALJ to

resolve." *Arrington v. Colvin*, 216 F. Supp. 3d 217, 240 (D. Mass. 2016), *aff'd sub*

*nom. Arrington v. Berryhill*, No. 17-1047, 2018 WL 818044 (1st Cir. Feb. 5, 2018) (quoting *Lee*

*v. Astrue*, Civil Action No. 10–10708–DJC, 2011 WL 2748463, at *11 (D. Mass. July 14, 2011)

(slip op.)).

Additionally, the ALJ discussed Plaintiff's treatment at Sunrise, the records of which

were inconsistent with the extreme limitations assigned by Dr. Rodriguez.  When Plaintiff began

treatment at Sunrise in September 2018, his appearance, behavior, speech, thought content,

thought process, intellectual functioning, orientation, insight, and judgment were all within

normal limits (A.R. 625-33).  The following month, Plaintiff presented as a "fair historian" with

concrete thought processes, no abnormal or psychotic thoughts, mildly impaired attention,

concentration, fund of knowledge, short-term memory, and long-term memory, moderately

impaired judgment/insight, full orientation, and normal comprehension and expression (A.R.

620-22).  In November 2018, Plaintiff's mental status examination was largely normal; Plaintiff

exhibited only a mild impairment to his judgment/insight and an anxious mood and affect (A.R.

1000-03).  Plaintiff was prescribed psychiatric medications to treat his symptoms (A.R. 1004).

When Plaintiff met with Dr. Rodriguez for the first time in January 2019, he was irritable and his insight and judgment were limited, but he was cooperative, coherent, relevant, and logical, his concentration was fair and his attention good, and he was alert and fully oriented (A.R. 997).  Plaintiff reported that his current medications were not working, and Dr. Rodriguez adjusted them (A.R. 998).  When Plaintiff followed up with Dr. Rodriguez in April 2019, he was irritable and angry with moderately impaired concentration.  His judgment/insight was severely impaired.  Other findings were normal (A.R. 991-96).  Dr. Rodriguez adjusted Plaintiff's medications again (A.R. 994).  When Dr. Rodriguez saw Plaintiff the following month, Plaintiff exhibited mild impairment of judgment/insight and was irritable, but there were no other remarkable findings (A.R. 1046-51).  In a July 2019 appointment with Dr. Rodriguez, Plaintiff exhibited irritability, but his mental status examination was otherwise normal (A.R. 1052-57).

Plaintiff saw Dr. Rodriguez again in October 2019, at which time he reported having stopped taking his medications (A.R. 1142-47).  Yet the only remarkable findings on mental status examination were that Plaintiff was sad, angry, and anxious, and had a moderate impairment of his concentration and judgment/insight (A.R. 1144-45).  Dr. Rodriguez changed Plaintiff's medications (A.R. 1145).  The following month, in November 2019, Plaintiff reported to Dr. Rodriguez that he was feeling more relaxed and calmer with the new medications (A.R. 1136-41).  Other than loud speech, a moderate impairment to his judgment/insight, an irritable mood, and a labile affect, Plaintiff's mental status was normal (A.R. 1138-39).  In January 2020, Dr. Rodriguez's mental status examination of Plaintiff resulted in findings that Plaintiff exhibited a sad mood and affect, was angry and anxious, and had a moderate impairment of his concentration and judgment/insight (A.R. 1132-33).  Dr. Rodriguez adjusted Plaintiff's medications (A.R. 1133).  In May 2020, Plaintiff reported being overwhelmed with the COVID-

19 lockdown and that he had not been able to pick up his medications the previous month (A.R. 1185-88).  Plaintiff was irritable and exhibited mildly impaired concentration and insight and moderately impaired judgment (A.R. 1185-88).

Finally, in November 2020, Plaintiff reported discontinuing all medications due to an episode of diverticulitis (A.R. 1192-95).  Plaintiff was irritable and anxious, had a mild impairment to his concentration, and a moderate impairment to his judgment/insight, but all other findings were normal (A.R. 1193-94).  Thus, the treatment notes from Sunrise, including those of Dr. Rodriguez himself, with the exception of one visit, reveal, at most, moderate limitations to Plaintiff's judgment/insight and concentration.  Once again, the inconsistency between the treatment notes and Dr. Rodriguez's opinion as expressed in the mental health questionnaire was for the ALJ to weigh and resolve.  *Arrington*, 216 F. Supp. 3d at 240.

There is also evidence in the record contradicting Dr. Rodriguez's opinion that Plaintiff had a complete inability to function independently outside the area of his home due to anxiety (A.R. 1011).  Plaintiff reported going to the beach and Six Flags amusement park as leisure activities in 2017.  In 2018, Plaintiff traveled to Disney with his family and, in 2019, Plaintiff went on a cruise.  Finally, Dr. Rodriguez's treatment notes fail to reflect any episodes of decompensation, each of at least two weeks duration, let alone four or more as Dr. Rodriguez opined in the mental health questionnaire.  For all these reasons, the ALJ did not err in assigning little weight to the opinion of Dr. Rodriguez.

Plaintiff resists this conclusion, arguing that the ALJ's reasoning for rejecting Dr. Rodriguez's opinion "is incorrect as reliance on reported normalcy and stability is erroneous" (Dkt. No. 18 at 12).  Plaintiff cites two cases, *Morin v. Astrue*, Civil No. 10-cv-159-JL, 2011 WL 2200758 (D.N.H. June 6, 2011), and *Kohler v. Astrue*, 546 F.3d 260 (2d Cir. 2008), in support of

this claim.  In *Morin*, the court noted that "a medical opinion that a patient's condition is stable 'does not compel the conclusion that [a] claimant was capable of engaging in substantial gainful activity ….'"  *Id.* at *8 (quoting *Barriault v. Astrue*, No. 07-cv-176-SM, 2008 WL 924526, at *7 (D.N.H. Apr. 2, 2008)).  Because a claimant could be "stable at a low functional level," *Kohler*, 546 F.3d at 268, " a conclusion that a patient is 'stable' must be evaluated for  purposes of an RFC determination in the context of a patient's entire medical record."  *Morin*, 2011 WL 2200758, at *8.  The problem for Plaintiff is that the ALJ did not use the word "stable" when assigning Dr. Rodriguez's opinion little weight.  Rather, the ALJ relied on the fact that there were many times when Plaintiff's examinations at Sunrise were "fairly normal overall" in deciding to accord little weight to Dr. Rodriguez's opinion that Plaintiff had extreme and disabling limitations (A.R. 34).  Neither *Morin* nor *Kohler* suggest that it would be error for an ALJ to rely on the inconsistency between "fairly normal" mental status examinations and a treating physician's assignment of extreme limitations as a basis for discounting the physician's opinion.  Thus, Plaintiff's reliance on *Morin* and *Kohler* is unavailing.

    V.    CONCLUSION

    Based on the foregoing, Plaintiff's motion for judgment on the pleadings (Dkt. No. 17) is DENIED and the Commissioner's motion to affirm (Dkt. No. 20) is GRANTED.  The clerk is directed to close the case.

    It is so ordered.

Date:  January 3, 2023                    /s/ Katherine A. Robertson
                                          KATHERINE A. ROBERTSON
                                          U.S. MAGISTRATE JUDGE